UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

LOUIS J. PEARLMAN, *et al.,*                          Case No. 6:07-bk-00761-KSJ
                                                      Chapter 11
          Debtor.                                     Substantively Consolidated

_____/

SONEET R. KAPILA, as CHAPTER 11
TRUSTEE for LOUIS J. PEARLMAN *et al,*
                                                      Adv. P. No.6:09-00474-KSJ
          Plaintiff,

v.

SUNTRUST MORTGAGE, INC.

          Defendant.

_____/

### TRUSTEE'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Plaintiff, Soneet R. Kapila (the "Plaintiff' or "Trustee"), Chapter 11 trustee of the estate

of the Debtors, Louis J. Pearlman ("Pearlman") and each of the substantively consolidated

debtors (collectively, the "Debtors"), by and through undersigned counsel, pursuant to Fed. R.

Bankr. P. 7056, respectfully requests this Court to enter summary judgment in the Trustee's

favor as to the claims at issue in this adversary proceeding.  In support thereof, the Trustee states

as follows:

### I.      BACKGROUND

On March 1, 2007 (the "Petition Date"), Tatonka Capital Corporation, Integra Bank,

American Bank of St. Paul and First National Bank & Trust Company of Williston (collectively,

the "Petitioning Creditors") initiated an involuntary bankruptcy proceeding against Pearlman and

Trans Continental Airlines, Inc. ("TCA") under Chapter 11 of the United Stated Bankruptcy Code.

On March 8, 2007, the Petitioning Creditors filed an emergency motion for appointment of a Chapter 11 trustee. Subsequently, on March 16, 2007, this Court entered an Order Directing the Appointment of Chapter 11 Trustee, and, on March 27, 2007, the Trustee received from the office of the United States Trustee notification of his appointment as Chapter 11 Trustee in the Pearlman bankruptcy proceeding. On April, 5, 2007, an order for relief was entered against Pearlman and TCA.

Thereafter, the Trustee filed chapter 11 bankruptcy cases for the following entities related to and affiliated with Pearlman: *In re Louis J. Pearlman Enterprises, Inc.,* Case No. 6:07-bk-1505-KSJ; *In re Louis J. Pearlman Enterprises, LLC,* Case No. 6:07-bk-1779-KSJ;; *In re Trans Continental Records, Inc.,* Case No. 6:07-bk-00832-KSJ; *In re Trans Continental Studios, Inc.,* Case No. 6:07-bk-01504-KSJ; *In re Trans Continental Television Productions, Inc.,* Case No. 6:07-bk-01856-KSJ; *In re Trans Continental Aviation, Inc.,* Case No. 6:07-bk-02431-KSJ; *In re TC Leasing, LLC,* Case No. 6:07-bk-04161-KSJ; *In re Trans Continental Publishing, Inc.,* Case No. 6:07-bk-04160-KSJ; and *In re Trans Continental Management, Inc.,* Case No. 6:07-bk-02432-KSJ.

Thereafter, each of the above chapter 11 cases was administratively and substantively consolidated with and under the lead case of *In re Louis J. Pearlman,* Case No. 6:07-bk-00761-KSJ by order of the Court dated May 10, 2011 (Case No. 6:07-bk-00761-KSJ, ECF No. 3512).

On March 25, 2009, the Trustee filed his Complaint to Avoid and Recover Fraudulent Transfers and for Other Relief against SunTrust Mortgage, Inc. ("SunTrust") [ECF No. 1]. SunTrust filed its Answer and Affirmative Defenses on April 24, 2009 [ECF No. 4].

## II.   STATEMENT OF UNDISPUTED FACTS

### A. Pearlman's Fraud.

The Trustee's investigation into the Debtors' business operations revealed that for at least 15 years, Pearlman perpetrated a massive Ponzi scheme supported by multiple fraudulent programs. Kapila Aff. ¶ 8. He offered and sold unregistered securities to participants through a savings program known as the Employee Investment Savings Account (the "EISA Program"). Kapila Aff. ¶ 8; *see also* Pearlman Plea Agreement 18. The EISA Program was represented as a savings account offering high yield Money Market rates of interest. Kapila Aff. ¶ 8. The EISA Program was not an equity investment in TCA. Kapila Aff. ¶ 8; *see also* Pearlman Plea Agreement 18-20. The monies raised from the EISA investors were not placed into any savings account, but were instead used to further and perpetuate Pearlman's fraud against investors and financial institutions. Kapila Aff. ¶ 8; *see also* Pearlman Plea Agreement 18-21.

Pearlman also sold stock ("TCA Travel Stock") in a company called Trans Continental Airlines Travel Services, Inc. d/b/a Trans Continental Travel Services, a subsidiary of Trans Continental Airlines, Inc. (the "TCTS Stock Program"). Kapila Aff. ¶ 9; *see also* Pearlman Plea Agreement 18. Pearlman represented that dividends would be paid out at a rate of 8% per year. Kapila, Aff. ¶ 9, Exhibit A. The dividend rate increased to various rates by the bankruptcy petition date and generally ranged from 10% to 15%. Kapila Aff. ¶ 9. The monies raised from the stock investors were not used to purchase stock, but were instead used to further and

perpetuate Pearlman's fraud against investors and financial institutions.  Kapila Aff. ¶ 9; *see also* Pearlman Plea Agreement 18-21.

From at least 2003 and continuing through 2007, while the EISA Program and TCTS Stock Program were still being offered and sold, Pearlman, through fraudulent means, obtained loans from numerous financial institutions for the alleged purpose of, among other things, financing various real estate ventures, business ventures and for short-term capital needs.  Kapila Aff. ¶ 10; *see also* Pearlman Plea Agreement 21.  Most of the funds raised from Pearlman's fraud upon financial institutions were not used for their intended purpose but instead were utilized to further and perpetuate the massive fraud he was orchestrating generally against investors and financial institutions.  Kapila Aff. ¶ 10; *see also* Pearlman Plea Agreement 18-21, and 38.

**B.  Crudele's Role in Pearlman Fraud.**

Michael Crudele ("Crudele") was the highest commissioned sales agent for the Pearlman Ponzi Scheme.  Crudele Plea Agreement 20.  Despite the fact that he does not have a license to sell securities, Crudele personally sold $6,851,243.75 worth of the EISA Program and TCA Travel Stock to victims and the sales agents, under his direction, for which he received "overrides" or commissions, sold $75,387,040.92 worth of the EISA Program and TCA Travel stock to victims.  Crudele Plea Agreement 18-23.  In fact, in 2002, the State of Florida Department of Banking and Finance issued a Final Cease and Desist Order Against Crudele prohibiting him Crudele from selling securities.  Crudele Plea Agreement 18.

As detailed in his Plea Agreement, Crudele received $1,959,513.00 in commissions and an additional $2,124,606.00 in personal expense payments as compensation for his role and participation in the Pearlman Ponzi Scheme.  Crudele Plea Agreement 18 – 22.  Crudele

admitted in his Plea Agreement that the Debtors transferred $341,051.00 (i.e. the Mortgage Payments) to SunTrust for his benefit. Crudele Plea Agreement 22. The source of the funds transferred to SunTrust was from defrauded investors. Crudele Plea Agreement 22, *see also,* Kapila Aff. ¶ 30.

### C. The Bank Reconstruction and Discovery of SunTrust Transfers.

In the investigation conducted by the Trustee, over 150 bank accounts of the Debtors were identified. Kapila Aff. ¶ 11. Subpoenas were then served to several banks to produce bank records. Kapila Aff. ¶ 11. The Trustee's professionals performed the painstaking task of reconstructing the bank accounts of the Debtors, which took approximately two years. By early 2009, substantially all of the records subpoenaed had been received. The bank reconstruction has served as a source for the factual information underlying the fraud that Pearlman orchestrated through the Pearlman Ponzi Scheme. Kapila Aff. ¶ 12.

SunTrust does not dispute that $341,050.59 was transferred to SunTrust by the Debtors to satisfy mortgage obligations (the "Mortgage Payments") owed by Michael and Sheila Crudele, both of whom are non-debtors. Kapila Aff. ¶ 31; *see also* Def.'s Resp. to Pl.'s Interogg. Nos. 3, 11, and 12. These transfers were made to compensate Crudele for his illegal activities in connection with the Pearlman Ponzi Scheme. *See generally,* Crudele Plea Agreement. As detailed below, the Mortgage Payments are recoverable on a constructive fraud basis inasmuch as they provided no benefit to the estate. The Mortgage Payments are also recoverable as actually fraudulent given (1) Michael Crudele's active participation in the Pearlman Ponzi Scheme; and (2) the badges of fraud surrounding the Mortgage Payments in particular.

**D. The Pearlman Plea Agreement.**

On March 4, 2008, the United States Attorney filed the Plea Agreement signed by Louis J. Pearlman (the "Pearlman Plea Agreement"). In the Pearlman Plea Agreement, Pearlman acknowledged that he raised money from investors through two fraudulent investment programs. The first involved the sale of stock in Trans Continental Airline Travel Services, Inc., and the other involved investments that were placed in a program known as the Employee Investment Savings Account. Pearlman Plea Agreement 18-21. Pearlman admitted that, in fact, the two programs—

> "were Ponzi Schemes by which money raised from later investors would be used to pay off earlier investors."

Pearlman Plea Hr'g Tr. 18, March 4, 2008.

As a result of his investigations, the Trustee has concluded that Pearlman's admissions in his criminal proceedings are an accurate depiction of the fraud he was perpetrating. *See,* Kapila Aff. __.

**E. The Crudele Plea Agreement.**

On October 15, 2010, the United States Attorney filed the Plea Agreement signed by Michael J. Crudele (the "Crudele Plea Agreement"). *See* Crudele Plea Agreement. In the Crudele Plea Agreement, Crudele acknowledged that he sold the EISA Program and the Stock Program to investors and received commissions from TCA for such sales and the sales of other agents who worked under him. Crudele Plea Agreement 18-20. Crudele admitted that he benefitted from the Pearlman Ponzi Scheme and funds from defrauded investors in the EISA Program and Stock Program were used to pay the Mortgage Payments. Crudele Plea Agreement 20-22.

Crudele admitted that as a part of the Pearlman Ponzi Scheme, investor's funds were used to pay Crudele's personal expenses, including the amounts transferred to SunTrust on his behalf. Crudele Plea Agreement 22; *see also* Crudele Plea Hr'g Tr. 17, Oct. 19, 2010.

### III.   LEGAL ARGUMENT

**A.   Standard for Motion for Summary Judgment.**

Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.   The United States Supreme Court has reaffirmed the vitality of summary judgment as a method for the just, speedy and inexpensive disposition of cases. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

"Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in rule 56(c), except the mere pleadings themselves." *Celotex,* 477 U.S. at 324.  "Legal memoranda and oral argument are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion."  *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1372 (3d Cir. 1996). *See also Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) ("neither 'conclusory allegations nor unsubstantiated assertions' will satisfy the nonmovant's burden . . . pleadings are not summary judgment evidence").  Moreover, "[a] mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Allen v. Tyson Foods, Inc*., 121 F. 3d 642, 646 (11th Cir. 1997).

**B.     The Court Should Grant Summary Judgment for the Trustee on Each of Statutory Elements of his Fraudulent Transfer Claims Against SunTrust**

**1.     The Transfers Were Interests of the Debtors in Property.**

The threshold issue is whether the property transferred represents property of the Debtors or, more specifically, an interest of the Debtors in property.  *See* 11 U.S.C. §§ 547 and 548; *Parks v. FIA Card Services, N.A. (In re Marshall)*, 550 F.3d 1251, 1254 (10th Cr. 2008).  *See also Beiger v. IRS*, 496 U.S. 53, 59, 110 S.Ct. 2258, 2262-63, 110 L. Ed. 2d 46 (1990).

SunTrust's receipt of the Transfers is uncontroverted.  Def.'s Resp. to Pl.'s Interogg. Nos. 3, 11, and 12.  Even if this issue was contested, a review of the bank records, including bank statements and/or cancelled checks serve to establish the Debtor's interest in the accounts from which the transfers were made.  Kaplia Aff. ¶¶ 11-12 and 28-30, Ex. B.   As it relates to fraudulent transfer actions, the Eleventh Circuit has determined that "any funds under the control of the debtor, regardless of the source, are properly deemed to be the debtor's property, and any transfers that di minish that property are subject to avoidance." *Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177, 1180 (11th Cir. 1987).  The undisputed evidence in this case, as compiled by the Bank Reconstruction, demonstrates that the Debtors, *via* Pearlman, were in control of the funds at issue in this case and directed transfers to SunTrust.  Kaplia Aff. ¶¶ 11-12 and 28-30, Ex. B.

**2.     The Transfers Were Made During the Claw-back Period and are Recoverable.**

SunTrust has suggested that the relief sought by the Trustee is barred by the Statute of Limitations.  Def.'s Answer 10.[1]  SunTrust's argument however ignores applicable statutory

---

[1]  The law in this District is clear that summary judgment is an appropriate mechanism to dispose of affirmative defenses.  *Int'l Ship Repair and Marine Services, Inc. v. St. Paul Fire and Marine Ins. Co.,* 944 F. Supp. 886 (M.D. Fla. 1996).

authority, as well as relevant factual intricacies of this case. *Furr v. United States Department of Treasury Internal Revenue Service (In re Pharmacy Distributor Services, Inc.),* 455 B.R. 817, 823-24 (Bankr. S.D. Fla. 2011) ("This argument flies in the face of overwhelming case law holding that section 546 extends the time to pursue an avoidance action under section 544 so long as the underlying state law claim had not expired as of the date the bankruptcy case was filed."). The Trustee has asserted fraudulent transfer claims against SunTrust pursuant to sections 544, 548 and 550 of the Bankruptcy Code, as well as chapter 726 of the Florida Statutes. Comp. at ¶1; *see also* Def.'s Answer 1.

Section 546 of the Bankruptcy Code provided the Trustee until April 5, 2009 (two years after entry of the Order for Relief) to file claims. The Complaint was timely filed against SunTrust on March 25, 2009. The claims at issue do not include transfers where the Statute of Limitations had already expired. Indeed, as it relates to the Mortgage Payments, which occurred in February and March of 2005, the Trustee's claims were filed timely and in accordance with section 726.110 of the Florida Statutes and section 546 of the Bankruptcy Code. Courts have summarily rejected similar arguments raised by defendants to fraudulent transfer actions. *See, e.g., Tabas v. Gigi Advertising P'ship, (In re Kaufman & Roberts, Inc.),* 188 B.R. 309, 315 (Bankr. S.D. Fla. 1995) ("[T]he Trustee has two years within which to initiate § 544(b) claims that were in existence as of the date of the bankruptcy petition. The Defendant's argument in this regard is without merit."). Indeed, this Court has determined that—

> the relevant reach back period begins of the petition date and encompasses all transfers within four years prior, per the FUFTA statute of limitations. Because none of the transfers at issue occurred more than four years prior to the petition date on March 1, 2007 . . . the alleged transfers are the proper subject of the trustee's avoidance actions under § 544 of the Bankruptcy Code and FUFTA.

*Kapila v. TD Bank, (In re Pearlman),* 460 B.R. 306, 315 (Bankr. M.D. Fla. 2011).

SunTrust's Fifth Affirmative Defense is therefore unavailing and should not preclude entry of summary judgment in favor of the Trustee.

**3.      The Record Evidence Demonstrates That The Transfers Were Made With Actual Intent To Hinder, Delay, Or Defraud Creditors.**

The Trustee respectfully submits that the record evidence clearly demonstrates that the Transfers were made with actual intent to hinder, delay, or defraud creditors. It is undisputed that the transfers were made with monies belonging to defrauded investors with the Debtors having no legitimate means to repay these investors. *See generally,* Kapila Aff.; *see also* Crudele Plea Agreement 22.

**(a)      The Ponzi Scheme Presumption is Applicable to Establish Actual Intent because the Mortgage Payments Were Made In Furtherance of Pearlman's Ponzi Schemes.**

"[T]he label 'Ponzi Scheme' has been applied to any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud." *Bear, Stearns Securities Corp. v. Gredd* (*In re Manhattan Inv. Fund Ltd.*), 397 B.R. 1, 12, *8 (S.D.N.Y. Dec. 17, 2007) (quoting *Bayou Group v. WAM Long/Short Fund* (*In re Bayou Group, LLC)*, 362 B.R. 624, 633 (Bankr. S.D.N.Y. 2007) (citations omitted)).

Pearlman's admission relating to the Pearlman Ponzi Scheme is the most relevant, direct and probative evidence of the Ponzi Scheme orchestrated and conducted with respect to the Debtors. *Johnson v. Neilson* (*In re Slatkin)*, 525 F.3d 805, 812 (9th Cir. 2004) (finding "admissions in the plea agreement that [the debtor] operated a Ponzi Scheme, and that he did so with the actual intent to defraud, are more probative on these issues than any other evidence the Trustee could procure"); *In re McCarn's Allstate Fin., Inc.*, 326 B.R. at 851 (noting that "[o]ne

way to establish the existence of a Ponzi Scheme is through a guilty plea to an information or indictment that alleges facts sufficient to infer the existence of a Ponzi Scheme."); *In re Mark Benskin & Co., Inc.*, 161 B.R. 644, 648 (Bankr. W.D. Tenn. 1993) (giving "preclusive effect" to guilty pleas in avoidance and recovery action based on 11 U.S.C. §548(a)(l)).  "Even if the information or indictment did not specifically label the fraud a Ponzi Scheme, if the allegations in the information establish that the debtor intended to defraud the debtor's creditors, evidence of a guilty verdict or plea agreement admitting the charges can establish the existence of a Ponzi Scheme." *In re McCarn's Allstate Finance, Inc.,* 326 B.R. at 851.

And, even if Pearlman's Plea Agreement and the admissions therein were somehow deemed insufficient to establish the existence of a Ponzi Scheme or create a disputed issue of fact, the record evidence in this case makes the Pearlman Ponzi Scheme undeniably evident. Indeed, every professional to consider Pearlman's fraudulent enterprise—the Trustee and the receiver appointed before him—has recognized it as such.  Kapila Aff. 16-22.

Moreover, the Court has already determined that the EISA Program and TCTS Stock Program (of which Crudele served as a broker for and received compensation via the Mortgage Payments) were both "undisputedly Ponzi schemes."  *Kapila v. Integra Bank, N.A. (In re Pearlman),* 440 B.R. 569, 575 (Bankr. M.D. Fla. 2010).  Accordingly, the Trustee is entitled to the benefit of the "Ponzi Scheme Presumption."  In cases such as this "involving a Ponzi scheme, [the fraud] analysis is simplified because fraudulent intent is inferred." *Cuthill v. Greenmark, LLC (In re World Vision Entertainment, Inc.),* 275 B.R. 641, 656 (Bankr. M.D. Fla. 2002).  *See also, In re Manhattan Inv. Fund Ltd.,* 397 B.R. at 8 (Bankr. S.D.N.Y. 2007) ("[t]here is a general rule - known as the Ponzi scheme presumption - that such a scheme demonstrates actual intent as

a matter of law because transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors") (internal citations omitted).

Payments made to brokers selling Ponzi Scheme instruments are considered to be made in furtherance of the Ponzi Scheme. "The very nature of a Ponzi Scheme means that the fraud continues over a period of time. In other words, the fraud is not limited to one transaction. The viability of the scheme rests upon keeping it afloat, and enticing others to invest." *Bald Eagle Area School District v. Keystone Financial, Inc.,* No. Civ. A. 98-930, 1999 WL 719906, at 6 (W.D. Pa. February 8, 1999). Crudele, and his efforts to recruit new investors, was key to sustaining the Pearlman Ponzi Scheme. The compensation and benefits Crudele received, including the Mortgage Payments, incentivized his recruitment of victims and thereby furthered the Pearlman Ponzi Scheme. *In re World Vision Entertainment, Inc.,* 275 B.R. at 658 ("[A]ll payments made by a debtor in furtherance of a Ponzi Scheme are made with actual fraudulent intent."); *Zazzali v. 1031 Exchange Group LLC (In re DBSI, Inc.),* 476 B.R. 413, 423 (Bankr. D. Del. 2012) ("Such commissions and referral fees in this context would be made in furtherance of the DBSI Ponzi scheme, as the same was dependent upon the brokers/agents' sale if TIC interests to generate cash flow."). In *World Vision,* as in this case—

> The debtor used funds invested by new investors to make interest and principal payments to earlier investors. Any remaining funds were used to pay general and administrative expenses such as officer salaries and rent, to make occasional investments in companies not expected to generate any substantial return, and to enrich the debtor's insiders. The debtor recruited insurance agents to sell its promissory notes and paid the brokers commissions, such as those received by the Corporate Defendants in this adversary proceeding, to perpetuate the scheme. Without the brokers, the scheme would have collapsed much earlier. The debtor paid the brokers high commissions to induce them to continue the sales and to keep the cash flowing in. Without question, the debtor paid these commissions with the actual intent to defraud both current and future investors.

275 B.R. at 657.    Accordingly, as in *World Vision,* "the transfers were made with actual fraud

and are avoidable under Section 548 of the Bankruptcy Code and Florida Statutes Section

726.105." *Id.*

    **(b)**     **<u>Even if the Ponzi Scheme Presumption Were Inapplicable, the Record Evidence Establishes Sufficient Badges of Fraud which Amply Show that Transfers Were Made With Actual Intent to Hinder, Delay, or Defraud Creditors.</u>**

Regardless of the application of the Ponzi Scheme Presumption, "the presence of only

one [badge of fraud] has been held to justify a finding of actual fraudulent intent." *Meninger v.*

*Khanani (In re Khanani),* 374 B.R. 878, 889 (Bankr. M.D. Fla. 2005).

"Common badges of fraud include: (1) the lack or inadequacy of consideration for the

property transferred; (2) the existence of a family, friendship or other close relationship between

the transferor and the transferee; (3) the transferor's retention of the possession, control, benefits

or use of the property in question; (4) the financial condition of the transferor both before and

after the transfer took place, i.e. whether the transfer resulted in insolvency; (5) the cumulative

effect of these transactions and course of conduct after the onset of financial difficulties or

dependency or threat of suit by creditors; and (6) the general chronology and timing of the

transfer in question." *Khanani,* 374 B.R. at 889 (citing *Ingersoll v. Kriseman (In re Ingersoll),*

124 B.R. 116, 121-2 (Bankr. M.D. Fla. 1991).

With respect to the facts and circumstances surrounding Pearlman and his massive Ponzi

Scheme, there were a number of other indicia of fraud.  Based upon the Trustee's investigation,

he has concluded that the Debtors were insolvent from at least April 1, 2003 through and

including March 31, 2007.  Pearlman made false representations to individual and institutional

investors about the proposed, intended and actual use of the funds advanced to him and the

Debtors.   Pearlman failed to disclose the true nature and worth of his assets and fraudulent

enterprise as well as the fact that the actual use of monies provided by third parties would be

used to further the overall Ponzi Scheme, including making payments to insiders, repaying other

bank loans, repaying EISA and Stock investors and funding other related Pearlman entities.

Pearlman created false financial records, information and reports prepared by a fictional

accounting firm and presented the same to individuals and financial institutions to induce these

parties to advance monies, either in the form of investments or loans, into his Ponzi Scheme.

When the true financial state of the Debtors was revealed, Pearlman attempted to avoid

prosecution for his crimes by fleeing the country.

In sum, the record clearly establishes many badges of fraud in establishing Pearlman's

actual intent to hinder, delay, or defraud his creditors.   Crudele admitted to his involvement in

the Pearlman Ponzi Scheme including his receipt of millions of dollars in commissions.

Crudele's Plea Agreement also establishes that the Mortgage Payments to SunTrust were in

consideration of his illegal securities brokerage activities.   Like the commissions, the Mortgage

Payments were made with intent to hinder, delay, or defraud creditors.   *See In re Old Naples*

*Securities,* 343 B.R. 310 (Bankr. M.D. Fla. 2006); *Bauman v. Bliese et al. (In re McCarn's*

*Allstate Finance, Inc.),* 326 B.R. 843 (Bankr. M.D. Fla. 2005); *Cuthill v. Kime et. al (In re*

*Evergreen Security, Ltd.)* 319 B.R. 245, 253 (Bankr. M.D. Fla. 2003).

**B.      The Court Should Grant Summary Judgment for the Trustee Because the Transfers
         to SunTrust Were Constructively Fraudulent.**

In order to prevail on his constructive fraud based claims, the Trustee need only establish

that (1) the debtor was insolvent at the time of the transfer; and (2) the transfer was made for less

than reasonably equivalent value.   *Dionne v. Spangler* (*In re XYZ Options, Inc.),* 154 F.3d 1262,

1275 (11th Cir. 1998); *see also* 11 U.S.C. 548(a)(1)(B) and  Fla. Stat. § 726.105(1)(b).

1.  **The Debtors' Received Less Than Reasonably Equivalent Value in Exchange for the Transfers to Suntrust**

Neither the Bankruptcy Code nor the Florida Statutes defines the term "reasonably equivalent value."  However, Section 548 of the Bankruptcy Code defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor."  11 U.S.C. § 548(d)(2)(A).  "Debt" is defined as "liability on a claim."  11 U.S.C. § 101(12).  And "claim" includes any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A).

In applying these statutory definitions, courts consider the difference between market value and the actual value of what the debtor received.  *Dealers Agency Services, Inc. v. Clark (In re Dealers Agency Services, Inc.)*, 380 B.R. 608, 619 (Bankr. M.D. Fla. 2007) (citing *Vilsack v. O'Connor (In re Vilsack),* 356 B.R. 546, 553 (Bankr. S.D. Fla. 2006)). Essentially, the comparison focuses on 'what went out' versus 'what was received.'' *Id.* (citing *Leneve v. WLN (In re Leneve),* 341 B.R. 53, 57 (Bankr. S.D. Fla. 2006)(citations omitted)); *see also In re Worldvision*, 275 B.R. at 657; *In re Evergreen Sec.*, 319 B.R. at 253 (citing *Tower Envtl., Inc. v. Florida (In re Tower Envtl., Inc.),* 260 B.R. 213, 225 (Bankr. M.D. Fla. 1998)) (recognizing two critical questions for assessing reasonably equivalent value: (1) what value, if any, was received by the debtor in exchange for the transfer, and (2) if value was received, was it reasonably equivalent to the funds transferred).  The Eleventh Circuit has recognized that the "concept of 'reasonably equivalent value' does not demand a precise dollar-for-dollar exchange." *Advanced Telecomm Network, Inc. v. Allen (In re Advanced Telecomm. Network, Inc.),* 490 F.3d 1325, 1336 (11th Cir. 2007); *see also Menotte v. Leonard (In re Leonard),* 418 B.R. 477, 483 (Bankr. S.D. Fla. 2009).

"As a general rule of fraudulent transfer law, a debtor's payment on behalf of a third party typically remains avoidable in bankruptcy unless there was a clear benefit (or "value") to the debtor." *Goldberg v. Countrywide Home Loans, Inc.* (*In re Seaway Intern. Transport, Inc.*), 341 B.R. 333, 334 (Bankr. S.D. Fla. 2006). *See also Hall v. Arthur Young and Company (In re Computer Universe, Inc.),* 58 B.R. 28, 30 (Bankr. M.D. Fla. 1986) ("an insolvent debtor receives less than reasonably equivalent value where it transfers its property in exchange for consideration that passes to a third party."). However, "[c]ourts have created an exception when the debtor received the benefit of the original consideration." *Computer Universe,* 58 B.R. at 30. "In [ ] cases which have utilized this 'indirect benefit' exception, the debtor received the benefit of the goods, services, or use of money for which it paid." *Id.* at 31.

The "indirect benefit" exception may apply where a "debtor and the third party are so related or situated that they share an identity of interests." *The Unencumbered Assets Trust, as successor in interest to National Century Financial Enterprises, Inc. v. Biomar Technologies, Inc. (In re Nat. Century Financial Enterprises, Inc.),* 341 B.R. 198, 215 (Bankr. S.D. Ohio 2006). The rationale is that "what benefits one will, in such a case, benefit the other to some degree." *Id.* at 215. "The ultimate question then becomes one of determining the value of this vicarious benefit and testing it by the measure of 'reasonably equivalent' for the property transferred by the insolvent debtor." *Garrett v. Falkner (In re Royal Crown Bottlers of North Alabama, Inc.),* 23 B.R. 28, 30 (Bankr. N.D. Ala. 1982). Here, the Debtors' transferred more than $341,000.00 to SunTrust for the benefit of Crudele and satisfaction of Crudele's mortgage obligation. The Debtors' received no vicarious benefit from the Mortgage Payments as they had no ownership interest or obligation with respect to the mortgaged property.

SunTrust has not and cannot present evidence to demonstrate that TCA, the transferor in this case, benefited in any way by the Mortgage Payments. Indeed, SunTrust has admitted that the Mortgage Payments were made to satisfy the obligations of non-debtors. Def.'s Resp. to Pl.'s Interogg. Nos. 3, 11, and 12. SunTrust's argument that TCA may have been indebted to Crudele and that the Mortgage Payments proportionately reduced TCA's obligation to Crudele, is wholly without merit and borders on ridiculous when considered in light of the Crudele Plea Agreement. To the contrary, Crudele's fraudulent activities served to victimize investors and mire the Debtors in debt. The Mortgage Payments to SunTrust incentivized Crudele's fraud but provided no consideration to the Debtors. Accordingly, the Mortgage Payments are recoverable as fraudulent transfers. *See Bakst v. Lester (In re Amelung),* Adv. No. 09-01719-BKC-PGH, 2010 WL 1417742,*4* (Bankr. S.D. Fla. April 7, 2010) (concluding fraudulent transfer defendant provided no consideration to the debtors where debtors were not obligated on pay debt at issue, had no business involvement with the defendant and received nothing in exchange for the transfers).

**2. The Debtors Were Insolvent at the Time of the Transfers, or Became Insolvent as a Result of the Transfers**

Pursuant to Fla. Stat. § 726.103(1), "a debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." Fla. Stat. § 726.103(1). Under the Bankruptcy Code, the term "insolvent" means—

> (A) with reference to an entity other a partnership and a municipality, financial condition such that the sum such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—
> (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and
> (ii) property that may be exempted from property of the estate under section 522 of this title;

11 U.S.C. § 101(32)(A).

"Insolvency of the debtor as required by § 548(a)(1)(B) is established, when the Debtor is operating a Ponzi scheme." *In re Evergreen,* 319 B.R. at 253; *see also In re Rodriguez,* 209 B.R. 424, 432 (Bankr. S.D. Tex. 1997) ("An enterprise engaged in a Ponzi scheme is insolvent from its inception and becomes increasingly insolvent as the scheme progresses."). Moreover, having reviewed the Debtors' accounts and business operations, the Trustee has concluded that the Debtors were insolvent from at least April 1, 2003 through and including March 31, 2007. Kapila Aff. ¶ 35. Accordingly, the record establishes that the Mortgage Payments were made while the Debtors were insolvent.

## IV. CONCLUSION

For the reasons set forth herein, the Trustee respectfully requests that the Court enter summary judgment in his favor and against SunTrust as to each of the claims asserted in the Complaint.

GENOVESE JOBLOVE & BATTISTA, P.A.

By: /s/ Gregory M. Garno_____
     Gregory M. Garno, Esq. (FBN 087505)
     Monique D. Hayes, Esq. (FBN 0843571)

Miami Tower
100 S.E. Second Street, 44th Floor
Miami, FL 33131
(305) 349-2300 Telephone
(305) 349-2310 Facsimile
ggarno@gib-law.com
mhayes@gib-law.com

**SPECIAL COUNSEL FOR THE TRUSTEE**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served electronically or by United States Mail on the 26th day of August 2013 on the following:

U.S. Trustee
United States Trustee - ORL, 11
135 W. Central Blvd., Suite 620
Orlando, FL 32801

Samuel Miller, Esq.
Akerman Senterfitt
Post Office Box 231
Orlando, FL 32802

Soneet R. Kapila, Chapter 11 Trustee
P.O. Box 14213
Ft. Lauderdale, FL 33302

J. Ellsworth Summers, Jr.
Jacob J. Payne, Esq.
ROGERS TOWERS, P.A.
1301 Riverplace Boulevard,
Suite 1500
Jacksonville, Florida 32207

/s/ Gregory M. Garno
Gregory M. Garno