UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re ) | |
| ) | |
| LOUIS J. PEARLMAN, *et al.*, ) | Case No. 6:07-bk-00761-KSJ |
| ) | Chapter 7 |
| Debtor. ) | |
| ) | |
| | |
| SONEET R. KAPILA, as Chapter 11 ) | |
| Trustee for TRANS CONTINENTAL ) | |
| AIRLINES, INC., ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | Adversary No. 6:09-ap-00474-KSJ |
| ) | *consolidated with* |
| SUNTRUST MORTGAGE, INC., ) | Adversary No. 6:09-ap-00050-KSJ |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |
| ) | |

**MEMORANDUM OPINION PARTIALLY GRANTING
DEFENDANT'S AND PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT**

The Chapter 11 Trustee, Soneet R. Kapila, seeks to avoid and to recover four prepetition transfers totaling $341,051 (the "Transfers") made by one of the consolidated debtors, Trans Continental Airlines, Inc. ("TCA"), to the Defendant, SunTrust Mortgage, Inc. ("SunTrust"), as mortgage payments for Michael Crudele, a seller of the faux securities at the heart of Lou Pearlman's Ponzi scheme. The Trustee filed a five-count complaint to avoid the alleged actual and constructive fraudulent transfers under § 548 of the Bankruptcy Code[1] and § 726 of the

---

[1] 11 U.S.C. Section 101 *et. seq.* (the "Bankruptcy Code").

Florida Statutes (the Florida Uniform Fraudulent Transfer Act or "FUFTA").[2] Both parties now seek summary judgment.[3] The Court grants both motions at least in part holding that the Transfers are avoidable as constructively fraudulent transfers but that, as to two Transfers totaling $238,540.93, the Trustee cannot recover the monies from the Defendant under the "single satisfaction" rule.

Debtor Louis J. Pearlman and his co-debtor companies—Trans Continental Airlines ("TCA"), Trans Continental Records ("TCR"), and Louis J. Pearlman Enterprises ("Enterprises")—carried out various Ponzi schemes. Two schemes offered "investments" fitting the classic Ponzi scheme model. In one scheme, Pearlman offered investments in an entity called "Transcontinental Airlines Travel Services, Inc.," a defunct company dissolved in 1999 and had no assets (the "TCTS Stock Program"). The other scheme involved investments in an "Employee Investment Savings Account," through which Pearlman solicited investments into a purported high yield savings account based on misrepresentations (the "EISA Program"). For both Ponzi schemes, Pearlman used new investors' funds to pay off old investors and pocketed much of the investors' cash.

Michael Crudele sold investments in the TCTS Stock Program and the EISA Program for Pearlman and solicited other sales agents to sell the fraudulent securities.[4] Between 2003 and 2006, Crudele's company, AIGIS Consulting, received nearly $5,000,000 in sales commissions

---

[2] The counts are titled:
    Count I: Actual Fraud – Avoidance and Recovery of Fraudulent Transfers Received by Defendant under 11 U.S.C. §§ 544(b), 548(a)(1)(A), 550 and Florida Statutes 726.01 et al.
    Count II: Actual Fraud – Avoidance and Recovery of Fraudulent Transfers Received by Defendant under 11 U.S.C. §§ 544(b)(1) and 550 and Fla. Stat. §§ 726.105(1)(a) and 726.108
    Count III: Constructive Fraud – Avoidance and Recovery of Fraudulent Transfers Received by Defendant under 11 U.S.C. §§ 548(a)(1)(B) and 550
    Count IV: Constructive Fraud – Avoidance and Recovery of Fraudulent Transfers Received by Defendant under 11 U.S.C. §§ 544(b)(1) and 550 and Fla. Stat. §§ 726.106(1)(b), 726.106(1), and 726.108.
    Count V: Unjust Enrichment

[3] Doc. Nos. 40 and 58.

[4] *See* Crudele Plea Agreement (Doc. No. 42, Ex. D) at 18-19.

from selling TCTS and EISA program securities. Crudele personally received $1,959,513 in sales commissions.[5] Crudele also maintained an account with TCA through which he could direct TCA to pay his personal expenses.[6] Using this account, TCA made four transfers to SunTrust to pay Crudele's mortgage payments on two parcels of real estate.[7]

Two Transfers, totaling $238,540.93, were applied to the note and mortgage on property in Illinois called the "Captains Drive Property". TCA paid SunTrust via two checks—one for $100,000 on February 11, 2005, and another for $138,540.93 on March 10, 2005 (the "Captains Drive Transfers").[8] The two payments left a remaining balance of $678.27 on the note, which was soon satisfied.[9] SunTrust executed a satisfaction of the mortgage on the Captains Drive Property on May 9, 2005.[10]

Less than a year later, on February 27, 2006, the Crudeles sold the Captains Drive Property to unrelated parties and received $515,619.44 from the sale.[11] Little more than a week after the sale, on March 8, 2006, Crudele deposited exactly $515,619.44 into his account with TCA.[12]

The remaining two Transfers, totaling $102,509.96, were paid by TCA towards Crudele's note and mortgage encumbering a different property in Florida called the "San Marco Street Property". Both payments were made by check drawn on TCA's checking account—one for $100,000 drawn on February 11, 2005, and another for $2,509.96 drawn on March 10, 2005

---

[5] Crudele Plea Agreement (Doc. No. 42, Ex. D) at 19-20.
[6] Crudele's account statement from TCA (Doc. No. 57, Ex. C) contains a number of "deposits" with asterisks after the line item description. His plea agreement suggests that all "deposits" identified with an asterisk on the account statement were actually based on a credit system where funds would be drawn from the fraudulent TCA and EISA programs to satisfy his withdrawals. *See* Crudele Plea Agreement (Doc. No. 42, Ex. D) at 22-23.
[7] *See* Doc. No. 57, Exhibit C (showing the Transfers as "withdrawals" of $200,000 on February 11, 2005, $138,540.93 on March 10, 2005, and another $2,509.96 on March 10, 2005).
[8] Doc. No. 58-1, Exhibit 9.
[9] Doc. No. 58-1, Exhibit 6.
[10] The satisfaction on the mortgage for the Captains Drive Property was recorded in Carroll County, Illinois on May 31, 2005. (Doc. No. 58-1, Exhibit 8.)
[11] *See* Doc. No. 58-2 and attached Exhibits.
[12] *E.g.*, Doc. No. 57, Exhibit C (Crudele's TCA account statement produced by the Trustee); Doc. No. 61 at ¶ 13 (Trustee's affidavit).

("San Marco Street Transfers").[13] SunTrust applied both payments to Crudele's loan on the San Marco Street Property.[14] On December 23, 2005, Crudele sold the San Marco Street Property for $1,126,949.92, and used the proceeds to acquire a substitute property, the "Mandalay Avenue Property", via a 1031 exchange.[15] Months later, on September 29, 2006, Crudele sold the Mandalay Avenue Property to Lou Pearlman for $1,425,000.[16] Crudele received $1,394,223.98 from the Mandalay Avenue Property sale, and, a few days later, on October 3, 2006, he deposited $295,000 into his TCA account.[17]

The Trustee seeks summary judgment on all counts.[18] SunTrust does not dispute the *avoidability*[19] of the Transfers but, in its own motion,[20] seeks summary judgment arguing that the Trustee can recover no monies from SunTrust under Section 550 of the Bankruptcy Code because, as to the two Captains Drive Transfers, the monies already were repaid to TCA and, therefore, the "single satisfaction" rule applies barring duplicate payments on the same obligation. SunTrust also argues that recovery of the two San Marco Street Transfers is not possible because (i) the Defendant is not the initial transferee and is entitled to rely on the good faith defense of § 550(b) of the Bankruptcy Code, (ii) the "single satisfaction" rule again applies,

---

[13] Doc. No. 58-1, Exhibit 9.
[14] Doc. No. 58-1, Exhibit 5.
[15] (Doc. No. 57-4, Exhibit B; Doc. No. 57-5, Exhibit A.) A "1031" exchange refers to an exchange under 26 U.S.C. § 1031, which provides that "No gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment." 26 U.S.C. § 1031.
[16] Doc. No. 57-6, Exhibit 3.
[17] Doc. No. 57-6, Exhibit 3 (showing "Cash to Seller" of $1,394,223.98); Doc. No. 57, Exhibit C (Crudele's TCA account statement produced by Trustee); Doc. No. 61 at ¶ 13 (Trustee's affidavit).
[18] The Trustee's motion and related filings include: Doc. Nos. 40, 41, 42 46 and 61.
[19] SunTrust's responses to the Trustee's motion for summary judgment include: Doc. Nos. 44, 51, and 57.
[20] Doc. No. 58. The Trustee filed a response to SunTrust's motion for summary judgment: Doc. No. 62. SunTrust filed a reply. Doc. No. 63.

albeit factual issues exist that preclude summary judgment, and (iii) equity prohibits recovery against SunTrust.[21]

The Parties move for summary judgment under Federal Rule of Civil Procedure 56.[22] Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[23] The moving party has the burden of establishing the right to summary judgment.[24] A "material" fact is one that "might affect the outcome of the suit under the governing law."[25] A "genuine" dispute means that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[26] Once the moving party has met its burden, the nonmovant must set forth facts showing there is a genuine issue for trial.[27] In determining

---

[21] SunTrust also initially argued that this Court cannot finally adjudicate the Trustee's fraudulent transfer claims, despite being labeled as "core" claims under 28 U.S.C. Section 157(b)(2). (Doc. No. 44 at 7-8.) *See generally Stern v. Marshall*, — U.S. —, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011). SunTrust later filed its own motion for partial summary judgment seeking affirmative relief and making no reference to its *Stern* objection. (Doc. No. 58.) By asking this Court for a final judgment in its favor, SunTrust has consented to this Court's jurisdiction and waived its *Stern* objection. "If a *Stern* objection were not deemed waived by the party making it seeking summary judgment, then the party could seek or permit a substantive ruling by the Bankruptcy Court, and then waive that objection if the ruling is favorable but insist on it if unfavorable, and get a second bite at the apple." *In re Carter*, 506 B.R. 83, 88 (Bankr. D. Ariz. 2014); *see also Ogier v. Johnson*, 1:13-CV-01490-WSD, 2013 WL 6843476 at *6 (N.D. Ga. Dec. 27, 2013).

In ruling, this Court explicitly declines to decide whether the Trustee's claims fall in the gambit of *Stern* claims. *Compare In re Gladstone*, 513 B.R. 149, 160 (Bankr. S.D. Fla. 2014) ("[T]his Court is guided by 11th Circuit precedent that fraudulent transfer claims brought under 11 U.S.C. §§ 548 or 544 are core matters subject to entry of final orders and judgments in the bankruptcy court.") *with In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553, 565 (9th Cir. 2012) (holding bankruptcy courts cannot enter final judgment on fraudulent transfer claims) *aff'd sub nom. Executive Benefits Ins. Agency v. Arkison*, — U.S. —, 134 S. Ct. 2165, 189 L. Ed. 2d 83 (2014) (affirming but declining to decide whether bankruptcy courts can enter final judgment on fraudulent transfer claims).

Finally, if the Court enters a final judgment and the District Court later determines a jurisdictional issue, the Middle District of Florida's Standing Order of Reference permits the district court to treat this Court's ruling as proposed findings of fact and conclusions of law. *In re: Standing Order of Reference Cases arising Under Title 11, Unites States Code*, 6:12-mc-26-ORL-22 (M.D. Fla. Feb. 22, 2012) ("The district court may treat any order of the bankruptcy court as proposed findings of fact and conclusions of law in the event the district court concludes that the bankruptcy judge could not have entered a final order or judgment consistent with Article III of the United States Constitution.").

[22] Fed. R. Civ. P. 56, made applicable to adversary proceedings by Fed. R. Bankr. P. 7056.
[23] Fed. R. Civ. P. 56(a).
[24] *Fitzpatrick v. Schlitz (In re Schlitz)*, 97 B.R. 671, 672 (Bankr. N.D. Ga. 1986).
[25] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011) .
[26] *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.
[27] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 10 S. Ct. 1348 (1986).

entitlement to summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."[28]

### **The Transfers are Avoidable as Constructive Fraudulent Transfers**

The Trustee argues that the Transfers are both actually and constructively fraudulent under § 548 of the Bankruptcy Code and § 726.105 of the Florida Statutes. SunTrust advances no argument challenging the *avoidability* of the Transfers.[29] Rather, SunTrust primarily argues that, even if the Transfers technically are *avoidable*, they are not *recoverable* under § 550.

The Transfers are avoidable under both the federal and state fraudulent transfer law. The Trustee's state law fraudulent transfer claims, asserted through § 544(b) of the Bankruptcy Code, are analogous "in form and substance" to their bankruptcy counterparts "and may be analyzed contemporaneously."[30] The only material difference between the state and bankruptcy provisions is the favorable four-year look-back period under the Florida law.[31] To assert his state law claims under § 544(b), the Trustee must allege and prove "the existence of at least one unsecured creditor of the Debtor who at the time the transfer in question occurred could have, under applicable local law, attacked and set aside the transfer under consideration."[32] The undisputed evidence shows that a Ponzi scheme was ongoing while TCA made the Transfers to SunTrust,

---

[28] *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).

[29] In its initial response (Doc. No. 44), SunTrust argued that TCA received reasonably equivalent value, albeit for § 548(c) purposes, because it owed a debt to Crudele for commissions that was satisfied by the Transfers to SunTrust. But SunTrust did not point to any evidence meeting the standards of Rule 56 to show TCA was liable to pay Crudele the value of the transfers. *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials . . . ."). Conclusory allegations by either party, without specific supporting facts, have no probative value. *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985). SunTrust did not meet its burden to "come forward with specific facts showing a there is a genuine issue for trial" on whether TCA received value. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 s. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).

[30] *In re Stewart*, 280 B.R. 268, 273 (Bankr. M.D. Fla. 2001). *See also In re Toy King Distributors, Inc.*, 256 B.R. 1, 126-27 (Bankr. M.D. Fla. 2000).

[31] *Compare* 11 U.S.C. § 548(a)(1) (providing for two-year look-back period) *with* Fla. Stat. § 726.110 (2014) (providing for four-year look-back period). *See also In re McCarn's Allstate Finance, Inc.*, 326 B.R. 843, 848-49 (Bankr. M.D. Fla. 2005).

[32] *In re Smith*, 120 B.R. 588, 590 (Bankr. M.D. Fla. 1990); *accord In re McCarn's Allstate Finance, Inc.*, 326 B.R. 843, 848-49 (Bankr. M.D. Fla. 2005).

and any of the hundreds of investor-creditors in this case could have brought a claim under § 726.105 of the Florida Statutes.[33] The Court analyzes the Trustee's claims under § 548 of the Bankruptcy Code and § 726 of the Florida Statutes together.[34]

To prevail under the constructive fraud theory, the Trustee must prove by a preponderance of evidence that the Debtor was (1) "insolvent at the time the transfer was made" and (2) "received less than reasonably equivalent value in exchange for the transfer."[35] As for the first prong, insolvency, "[t]here is little debate that a company run as a Ponzi scheme is insolvent as a matter of law."[36] This Court already has held that the TCTS Stock Program and the EISA Program were both Ponzi schemes.[37] SunTrust does not dispute the existence of a Ponzi scheme and repeatedly refers to the "Pearlman Ponzi Scheme" throughout its response to the Trustee's motion.[38] And the undisputed record evidence, including Pearlman's plea agreement, shows that the TCTS Stock Program and the EISA Program were both Ponzi schemes.[39] Further, the Trustee, who is intimately familiar with the TCA's books and records, accounts, and business

---

[33] *See, e.g.*, Affidavit of Soneet Kapila (Doc. No. 41 at 4-7); Pearlman Plea Agreement (Doc. No. 42, Exhibit A) at 18.

[34] The applicable petition date is March 1, 2007. "[T]he relevant reach back period begins on the petition date and encompasses all transfers within the four years prior, per the FUFTA statute of limitations." *Kapila v. TD Bank, N.A. (In re Pearlman)*, 460 B.R. 306, 314-15 (Bankr. M.D. Fla. 2011); *see also* 11 U.S.C. § 546(a). The first two Transfers, made on February 11, 2005, are governed solely by § 726 of the Florida Statutes because they fall outside § 548's two-year look-back period. The latter two Transfers, made on March 10, 2005, can be analyzed under both statutes because they occurred within both look-back periods..

[35] *In re Evergreen Sec., Ltd.*, 319 B.R. 245, 253 (Bankr. M.D. Fla. 2003) (citing *In re XYZ Options, Inc.*, 154 F.3d 1262, 1275 (11th Cir. 1998)).

[36] *In re ATM Fin. Servs., LLC*, 6:08-BK-969-KSJ, 2011 WL 2580763 (Bankr. M.D. Fla. June 24, 2011).

[37] *See In re Pearlman*, 440 B.R. 569, 575-76 (Bankr. M.D. Fla. 2010) ("[T]he EISA Program and the TCTS Stock Program . . . are both undisputedly Ponzi schemes.").

[38] *See* Doc. No. 44 at 1-3.

[39] A Ponzi scheme generally is defined as a "phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors." *United States v. Silvestri,* 409 F.3d 1311, 1317 n.6 (11th Cir.2005). All evidence showed this was precisely what occurred. *See e.g.*, Pearlman Plea Agreement (Doc. No. 42, Exhibit A) at 17-22 (stating that the TCTS Stock Program and the EISA Program "were 'Ponzi' schemes by which money raised from later investors would be used to pay off earlier investors"); Affidavit of Soneet Kapila (Doc. No. 41) at ¶¶ 16-22.

operations, concluded that the Debtor was insolvent when the Transfers were made.[40] TCA was insolvent when the Transfers were made.

The Trustee also showed that TCA did not receive reasonably equivalent value for the Transfers. The Trustee advances the "wrong payor" argument: because TCA paid SunTrust to satisfy Crudele's mortgage obligation, TCA did not receive value from the transaction, only Crudele did. The "wrong payor" argument rests on the "general rule of fraudulent transfer law" that holds "a debtor's payment on behalf of a third party typically remains avoidable in bankruptcy unless there was clear benefit (or 'value') to the debtor."[41] Crudele benefitted from the mortgage payments, but based on the record evidence, the Court cannot find that TCA received any value or benefit from the mortgage payments by TCA to SunTrust.

The Transfers are avoidable as constructive fraudulent transfers under § 548(a)(1)(B) of the Bankruptcy Code and § 726.105(1)(b) of the Florida Statutes via § 544 of the Bankruptcy Code. Because the transfers clearly are avoidable under constructive fraud theories, the Court declines to reach the factual issues raised in the actual fraud counts, although such actual fraud likely occurred given Crudele's close relationship with Mr. Pearlman and his intimacy with the Pearlman Ponzi Scheme. The Court partially grants the Trustee's motion for summary judgment in this limited respect—to hold that the Captains Drive Transfers and the San Marco Street Transfers are *avoidable* as constructively fraudulent. But, avoidability does *not* necessitate recoverability.

## **Recoverability of Transfers under 11 U.S.C. § 550**

Once a transfer is deemed avoidable, the court then must determine whether the recipient is liable for the return of the property or for the payment of the property's value under § 550 of

---

[40] Doc. No. 41 at ¶ 35.
[41] *In re Seaway Intern. Transport, Inc.*, 341 B.R. 333, 334 (Bankr. S.D. 2006).

the Bankruptcy Code.[42] "In fraudulent transfer actions, there is a distinction between avoiding the transaction and actually recovering the property or the value thereof."[43]

SunTrust argues under § 550 it is not liable for the Transfers because (i) under the "single satisfaction" rule, TCA already received payment for the Captains Drive Transfers and factual issues preclude a determination of TCA's receipt of payment of the San Marco Street Transfers,[44] (ii) Crudele, not SunTrust, is the initial transferee of the Transfers and SunTrust may rely on the good faith defense of § 550(b), and (iii) equity prohibits any recovery.

### **TCA was Repaid in Full for the Captains Drive Transfers**

SunTrust first argues that TCA was fully repaid for the Captains Drive Transfers ($238,540.93) when Crudele deposited the proceeds from the sale of the Captains Drive Property ($515,619.44) back into TCA. SunTrust relies on the "single satisfaction" rule arguing that Crudele's repayment of traceable proceeds from the sale of the mortgaged property put TCA back into the same or better position than it was in before the Captains Drive Transfers were made.[45]

"The power of the trustee to avoid certain transfers prevents the depletion of the estate, promotes an equitable distribution of the debtor's assets, and protects creditors who advanced

---

[42] *In re McCarn's Allstate Fin., Inc.*, 326 B.R. 843, 852 (Bankr. M.D. Fla. 2005) ("Once a court determines that transfers are avoidable under Bankruptcy Code section 548 or under Florida Statutes section 726.105, (available to the Trustee under Bankruptcy Code section 544(b)), the Court must then look to Bankruptcy Code section 550 to determine the liability of the transferee of the avoided transfer."); *see also In re Int'l Admin. Servs., Inc.*, 408 F.3d 689 (11th Cir. 2005) (discussing recoverability issues under § 550 for transfers avoided under § 544 and FUFTA). *But see In re Jackson,* 318 B.R. 5, 26 (Bankr. D.N.H. 2004) *subsequently aff'd*, 459 F.3d 117 (1st Cir. 2006) (holding that because the plaintiff could not prove avoidance of the transfers under § 548, and only proved elements of the state law fraudulent transfer causes of action through § 544, the plaintiff was limited to the state law recovery scheme and not § 550).

[43] *In re Kingsley*, 518 F.3d 874, 877 (11th Cir. 2008) (quoting *In re Int'l Admin. Servs.*, 408 F.3d 689, 703 (11th Cir. 2005)).

[44] SunTrust only seeks summary judgment as to the Captains Drive Transfers. Although its argument is essentially the same as to the San Marco Street Transfers, SunTrust maintains that factual issues—namely the traceability of Crudele's deposit and its relationship to the sale of the property—preclude summary judgment of those transfers.

[45] SunTrust makes a similar "single satisfaction" argument in connection with the San Marco Street Transfers but agrees material factual disputes preclude summary judgment as to the recoverability of those two transfers at this point. (Doc. No. 58 at n.2.)

credit in ignorance of fraud."[46] Consistent with these aims, § 550(d) states that a trustee "is entitled to only a single satisfaction under subsection (a) of this section."[47] This "single satisfaction rule" seeks to limit the trustee to a single recovery for his or her fraudulent transfer claim to ensure the bankruptcy estate is put back in its pre-transfer position but receives no windfall through the avoidance provisions. Application of § 550(d) is a matter of federal common law.[48]

Section 550(d) typically is used to prevent a trustee from collecting from multiple parties for the same transfer, i.e., an initial transferee and a subsequent transferee.[49] Courts also use § 550(d) however to temper the harsh application of § 550(a) when the estate already has received full repayment of the challenged transfers before the bankruptcy case was filed.[50] These decisions rely on the principle that § 550 "is designed to restore the estate to the financial condition that would have existed had the transfer never occurred."[51] The crux of the argument holds that if the bankruptcy estate receives prepetition repayment of fraudulent transfers, then the estate, at filing, is in the same position it would have been in notwithstanding the transfers.

In *Sawran,* the debtor transferred $20,000 from a personal injury settlement to her father prior to bankruptcy.[52] Because the debtor's father was concerned about the debtor's excessive spending, he planned to periodically disburse money to the debtor for her necessary expenses.[53] But the father fell ill and transferred the $20,000 to two of his other children, the defendants,

---

[46] *In re Prudential of Florida Leasing, Inc.*, 478 F.3d 1291, 1299 (11th Cir. 2007)
[47] 11 U.S.C. § 550(d).
[48] *Prudential of Florida Leasing*, 478 F.3d at 1300-01.
[49] *See, e.g.*, *Prudential of Florida Leasing*, 478 F.3d at 1297 ("In other words, the Trustee cannot obtain twice the full value of a fraudulent transfer by recovering that value from both the initial transferee and a subsequent transferee."); *Harrison v. Brent Towing Co. (In re H & S Transp. Co.)*, 110 B.R. 827, 832 (M.D. Tenn. 1990) (preventing trustee from recovering from both initial and subsequent transferee).
[50] *See, e.g.*, *In re Kingsley*, 06-12096-BKC-PGH, 2007 WL 1491188 (Bankr. S.D. Fla. May 17, 2007) *aff'd*, 518 F.3d 874 (11th Cir. 2008); *In re Sawran*, 359 B.R. 348 (Bankr. S.D. Fla. 2007); *In re Clarkston*, 387 B.R. 882 (Bankr. S.D. Fla. 2008).
[51] *In re Kingsley*, 518 F.3d 874, 877 (11th Cir. 2008) (quoting *Sawran*, 359 B.R. at 354).
[52] 359 B.R. 348 (Bankr. S.D. Fla. 2007).
[53] *Id.* at 352.

who he then tasked with ensuring the debtor's expense were paid. True to their promise, the defendants disbursed $12,000 of the $20,000 to the debtor before the petition date.[54] The bankruptcy court held that to permit the trustee to recover the $12,000 repaid prepetition from the defendants would result in a windfall to the estate and violate § 550(d)'s single satisfaction rule.[55] The court also held that "[t]o the extent that the Defendants made prepetition payments to the Debtor, the preferential transfer to the *initial transferee* has been satisfied."[56]

After *Sawran*, Judge Hyman applied the same principles to slightly different facts in *In re Kingsley*.[57] In *Kingsley*, the recipient of an actually fraudulent transfer used most of the transferred funds to pay expenses and creditors of the debtor.[58] The court again applied § 550(d) to hold that the trustee's claim was satisfied "to the extent the fraudulent transfer was repaid."[59] One notable distinction between *Kingsley* and *Sawran* is that in *Kingsley*, the court specifically found that the defendant was a wrongdoer and took the transfer knowing its fraudulent nature.[60] Still, the bankruptcy court held that it was impermissible to allow the trustee to receive a windfall and recover the fraudulent transfers under § 550 when the transferee had repaid most of the money transferred for the debtor's benefit prepetition.[61] The Eleventh Circuit affirmed, holding that the bankruptcy court was within its equitable discretion to limit the trustee's recovery.[62]

The Trustee attempts to distinguish the "single satisfaction" rule articulated in *Sawran* and *Kingsley* making three arguments. First, Crudele, not SunTrust, made the subsequent deposit

---

[54] *See id.* at 350-51. The defendants did disburse the remaining $8,000 to the debtor, but, because they did so post-petition, the estate did not benefit, and the defendants were liable to repay the $8,000. *See id.* at 354-55.
[55] *Id.* at 353.
[56] *Id.* (emphasis added).
[57] 06-12096-BKC-PGH, 2007 WL 1491188 (Bankr. S.D. Fla. May 17, 2007) *aff'd*, 518 F.3d 874 (11th Cir. 2008).
[58] *Id.* at *1.
[59] *Id.* at *4.
[60] *Id.*
[61] *Id.* at *4-6.
[62] *In re Kingsley*, 518 F.3d 874 (11th Cir. 2008).

back into TCA. Second, SunTrust benefitted from the Transfers. And third, TCA did not *retain* possession of the funds Crudele "repaid" because, after depositing the proceeds from the Captains Drive sale, he subsequently withdrew more money and depleted the estate. The Court will address each argument.

Because Crudele, not SunTrust, returned the proceeds from the Transfers to TCA does defeat the "single satisfaction" rule. The focus is whether the transfer was repaid, not who repaid it. Section 550(d)'s primary aim is to prevent the estate from receiving a windfall.[63] Recall that in *Sawran*, the bankruptcy court ultimately held "[t]o the extent that the Defendants [subsequent transferees] made prepetition payments to the Debtor, the preferential transfer to the *initial transferee* has been satisfied."[64] The court there determined that the fraudulent transfer to the initial transferee was satisfied by payments made by the mediate transferees.

The bankruptcy court took a similar stance in *In re Bassett*,[65] where the trustee sought to avoid a fraudulent transfer of real property to a subsequent transferee. Pre-petition, the subsequent transferee refinanced a note payable by the debtor and secured by the property.[66] Because the subsequent transferee's refinancing of the note released the debtor (and the estate) from liability on the original note, the court held that the trustee received satisfaction of the fraudulent transfer.[67] Similar to this case, the court further held that the subsequent transferee's (Crudele's) satisfaction through the refinancing also prevented the trustee from recovering from the *initial transferee* (SunTrust).[68]

---

[63] *See In re Clarkston*, 387 B.R. 882, 891 (Bankr. S.D. Fla. 2008).
[64] *Id.* (emphasis added). The adversary proceeding in *Sawran* was filed against only the subsequent transferees. A separate judgment already was entered against the debtor's father in a prior case, where he unfortunately acted *pro se*. Regrettably, he did not argue the "single satisfaction" defense to recoverability in the adversary proceeding against him.
[65] 221 B.R. 49 (Bankr. D. Conn. 1998).
[66] *Id.* at 51.
[67] *Bassett*, 221 B.R. at 55.
[68] *Id.*

Application of the single satisfaction rule as to the Captains Drive Transfers is appropriate in this adversary proceeding. Section 550(d) typically is used to protect one transferee when a different transferee in the transfer chain already has repaid the claim. One transferee's actions shield another transferee from duplicate liability. The Trustee here is not entitled to *both* the repayment of the transfer *and* to a separate judgment against a transferee. Here, Crudele repaid the transfer to SunTrust by returning the proceeds from the Captains Drive Property's sale to TCA *plus* almost $200,000 more. SunTrust is not liable to the Trustee for monies it received to pay Crudele's mortgage when TCA already received the proceeds from the sale of Captains Drive Property.

Second, that SunTrust benefitted from the Captains Drive Transfers is immaterial. SunTrust likely earned interest on the underlying mortgage loan. SunTrust's income, however, has absolutely nothing to do with the fraudulent transfer analysis asserted by the Trustee that focuses exclusively on loss to the bankruptcy estate. SunTrust's gain or loss simply is not a factor.

Third, the Trustee argues that, even though Crudele deposited the proceeds from sale of the Captains Drive Property into TCA, his subsequent withdrawal of funds from TCA should count against any "repayment." The Trustee's argument expands the analysis too far beyond the transfers in question. The issue is whether the transfers or traceable proceeds from the transfers were returned to TCA. They were. Crudele's subsequent actions cannot be attributed to SunTrust.

Each of the Trustee's arguments are true red herrings. TCA paid roughly $238,000 to SunTrust, and later received back about $515,000 from Crudele after the sale of the real estate. The proceeds more than repaid the earlier transfers. SunTrust is entitled to summary judgment

holding that, although the Captains Drive Transfers are avoidable, the Trustee cannot recover them from SunTrust under § 550(d) of the Bankruptcy Code.

Because the San Marco Street Transfers are more complex, however, factual issues preclude a similar finding as to their recoverability by the Trustee. The Court will consider the other arguments raised by SunTrust as to the recoverability of the San Marco Street Transfers.

### **SunTrust was an Initial Transferee**

SunTrust next asks the Court to decide that Crudele, not SunTrust, was the initial transferee of the Transfers. After a transfer is deemed avoided under "section 544 . . . [or section] 548" of the Bankruptcy Code, § 550(a) of the Bankruptcy Code entitles a bankruptcy trustee to recover from:

> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>
> (2) any immediate or mediate transferee of such initial transferee.[69]

Section 550(a)(2) however grants successor transferees a "good faith" defense denied to initial transferees. Section 550(b) specifically holds that a trustee may not recover from an immediate or mediate transferee that "takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided." The distinction therefore between initial transferee and a subsequent transferee who is allowed to argue good faith as a defense to recoverability is very meaningful.

In the Eleventh Circuit's *In re Harwell* decision, the Court looked to its precedents interpreting "initial transferee," specifically within the context of the judicially-crafted "mere conduit" exception to initial transferee liability. The court "observed that a literal or rigid interpretation of the statutory term 'initial transferee' in § 550(a) means that the first recipient of

---

[69] 11 U.S.C. § 550(a).

the debtor's fraudulently-transferred funds is an 'initial transferee.'"[70] However, the court's precedents showed that it had "carved out an equitable exception to the literal statutory language of 'initial transferee,' known as the mere conduit or control test, for initial recipients who are 'mere conduits' with no control over the fraudulently-transferred funds."[71]

*Harwell* provides guidance in determining whether a transferee is an initial transferee, but the decision mainly focused on "mere conduit" exception—the application of which is inapposite to the facts of this case.[72]

This Court however has applied *Harwell's* broader principles to circumstances somewhat similar to the present case. In *In re ATM Financial Services, LLC*,[73] I held that even though the defendant, the IRS, received payment for a non-debtor's tax obligations directly from the debtor's funds, the non-debtor—not the IRS—was the initial transferee. The IRS was entitled to § 550(b)'s good faith defense.

Like this bankruptcy case, *ATM Financial* involved a Ponzi scheme. Prepetition, the debtor made a large payment to the IRS for the tax obligations of a non-debtor entity, BDL, which the debtor's owner and principal, Vance Moore, Jr., also owned and ran.[74] After receiving several demands for payment of BDL's delinquent taxes from the IRS, Moore purchased a cashier's check drawn on the debtor's bank account to satisfy BDL's tax obligations.[75] The cashier's check labeled BDL as the remitter and accompanied a letter printed on BDL's letterhead, which directed the IRS to apply the check to BDL's tax liabilities.[76] After the Ponzi scheme was uncovered and the debtor entered chapter 7, the trustee filed a complaint to recover

---

[70] *Id.* at 1322.
[71] *Id.*
[72] The "mere conduit" exception is "an equitable exception to the literal statutory language of 'initial transferee,' . . . for initial recipients who are 'mere conduits' with no control over the fraudulently-transferred funds." *Harwell*, 628 F.3d at 1322. Because SunTrust was the end recipient of the Transfers, it certainly was not a mere conduit.
[73] 446 B.R. 564 (Bankr. M.D. Fla. 2011).
[74] *ATM Financial*, 446 B.R. at 566.
[75] *Id.*
[76] *Id.*

the transfer from the IRS as an initial transferee because, on the transaction's face, the check came from the debtor and was paid directly to the IRS.

The IRS argued, like SunTrust, that it should be a subsequent transferee and was entitled to § 550(b)'s "good faith" defense. In ruling that BDL, not the IRS, was the initial transferee, I held that the IRS was qualified as a subsequent transferee and entitled to § 550(b)'s defense.[77] Because Moore was a principal of both the debtor and BDL, after he purchased the cashier's check with the debtor's funds, he took control of the funds as BDL's president, rendering BDL the initial transferee.[78] When Moore mailed the check to the IRS with a letter on a BDL letterhead, BDL transferred the check to IRS; the IRS became a transferee from BDL and a subsequent transferee from the debtor.

The key distinction from the present case is that in *ATM Financial*, a transfer occurred from the debtor to BDL. Crudele's mere direction to TCA does not effectuate a transfer from TCA to Crudele. Both the Bankruptcy Code and FUFTA define "transfer" as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property."[79] Crudele told TCA to pay SunTrust to pay his mortgage; however, TCA never transferred any funds to Crudele. TCA retained full control over the funds until it paid SunTrust.[80] SunTrust was the initial transferee of the transfers and cannot benefit from § 550(b)'s good faith defense in connection with the recoverability of the Transfers.

### Equitable Defense is Premature

SunTrust lastly argues that equity should prevent the Trustee from recovering the San

---

[77] *Id.* at 568-71.
[78] *Id.* at 570-71.
[79] 11 U.S.C. § 101(54); Fla. Stat. § 726.102(12).
[80] *See In re Wayne*, 237 B.R. 506, 508-09 (Bankr. M.D. Fla. 1999) (holding that because debtor retained control of property, a transfer had not yet occurred). *See also Barnhill v. Johnson*, 503 U.S. 393, 401, 112 S. Ct. 1386, 1391, 118 L. Ed. 2d 39 (1992) (holding that upon payment by check, a transfer does not occur until the bank honors the check, reasoning that "until the moment of honor the debtor retains full control over disposition of the account and the account remains subject to a variety of actions by third parties.").

Marco Street Transfers. Both the Bankruptcy Code and FUFTA contain provisions that permit a bankruptcy court to consider equitable concerns in deciding how much a trustee should recover from a fraudulent transfer.[81]  "[T]he cornerstone of the bankruptcy courts has always been the doing of equity."[82] Section 105(a) of the Bankruptcy Code permits a bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."[83] These powers "must and can only be exercised within the confines of the Bankruptcy Code."[84] Courts have interpreted this limitation to mean that § 105(a) cannot be used "to authorize any relief that is prohibited by another provision of the Code."[85]  In this case, the Court will reserve ruling on whether equitable considerations should excuse SunTrust from repaying the San Marco Street Transfers until further evidence is presented at trial.  The Court will not consider the issue on summary judgment.

## **Conclusion**

The Court will partially grant the Trustee's motion for summary judgment[86] concluding that all four Transfers are constructively fraudulent transfers and are avoided.  The Court will deny the balance of the Trustee's motion as to SunTrust's liability to repay the avoided Transfers.  Similarly, the Court will grant SunTrust's motion for partial summary judgment[87] concluding that SunTrust has no liability to repay the Captains Drive Transfers under the "single satisfaction" rule.

Factual issues preclude summary judgment on these remaining issues relating to the recoverability of the San Marco Street Transfers totaling $102,509.96: (1) Has TCA been repaid so that the "single satisfaction" rule absolves SunTrust from liability? (2) Do equitable

---

[81] *See Kingsley*, 518 F.3d at 877.
[82] *Kingsley*, 518 F.3d at 877 (quoting *In re Waldron*, 785 F.2d 936, 941 (11th Cir. 1984)).
[83] 11 U.S.C. § 105(a).
[84] *Northwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S. Ct. 963, 99 L. Ed. 2d 169 (1988).
[85] *In re Transit Group, Inc.*, 286 B.R. 811, 815-16 (Bankr. M.D. Fla. 2002).
[86] Doc. No. 40.
[87] Doc. No. 58.

considerations excuse SunTrust's liability?  The Court encourages the parties to confer on possible settlement and trial preparation matters prior to the scheduled pre-trial conference set for 2:45 p.m. on October 8, 2014.  The Court simultaneously will enter a separate Partial Final Judgment consistent with this Memorandum Opinion.

DONE AND ORDERED in Orlando, Florida, on September 26, 2014.

KAREN S. JENNEMANN
Chief United States Bankruptcy Judge

Jacob Payne, attorney for SunTrust, is directed to serve a copy of this Order on interested parties and file a proof of service within 3 days of entry of the Order.